**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Ana L.R.,

                              Plaintiff,

                -against-

Commissioner of Social Security

                              Defendant.

1:25-cv-03700 (SDA)

**OPINION AND ORDER**

**STEWART D. AARON, United States Magistrate Judge:**

Plaintiff Ana L.R. ("Ana" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). (Compl., ECF No. 1.) Now before the Court is Plaintiff's motion to remand this case for further administrative proceedings. (Pl.'s 8/13/25 Mot., ECF No. 10.) For the reasons set forth below, Plaintiff's motion is DENIED and the decision of the Commissioner is AFFIRMED.

**BACKGROUND**

I.    **Procedural Background**

Ana filed an application for DIB on October 10, 2022, with an alleged onset date ("AOD") of July 15, 2022. (Administrative Record ("R."), ECF No. 9.) The SSA initially denied her application on February 13, 2023, and again, following her request for reconsideration, on July 6, 2023. (*Id*.) On August 11, 2023, Ana filed a request for a hearing before an ALJ. (*Id*.) A hearing was held on February 27, 2024, before ALJ Michael Stacchini. (R. 37.) Ana was represented at the hearing by

Attorney Sharon Broadhurst. (R. 37.) Ana appeared and testified, along with vocational expert Michele Erbacher ("VE Erbacher"). (*Id*.)

In a decision dated May 8, 2024, ALJ Stacchini found Ana not disabled. (R. 10-22.) On June 24, 2024, Ana requested review of the ALJ's decision by the Appeals Council. (R. 177.) The Appeals Council denied the request on March 7, 2025. (R. 1-3.) Ana commenced this action on May 2, 2025. (Compl., ECF No. 1). Ana filed the motion now before the Court on August 13, 2025. (*See* Pl.'s 8/13/25 Mot. at 1.) On January 28, 2026, the Commissioner's opposition brief was filed. (Comm'r's Br., ECF No. 17.) Ana did not file a reply memorandum.

## II.    **Non-Medical Evidence**

Born on October 31, 1971, Ana was 50 years old on the AOD. (*See* R. 684.) Ana completed two years of college at Hostos Community College in the Bronx by 1995 (R. 215) and worked as a senior police administrative aide for the New York City Police Department from July 2005 to July 2022. (R. 73, 191.)

## III.    **Medical Evidence**

Plaintiff's AOD (July 15, 2022) coincides with a motor vehicle accident, which she claims exacerbated certain conditions she already had been experiencing. (*See* Pl.'s 8/13/25 Mem. at 6-7.) Therefore, the Court briefly summarizes certain relevant medical evidence prior to the AOD before turning to medical evidence after the AOD.

### A.    **Medical Treatment Prior to the July 15, 2022 AOD**

On August 1, 2019, Plaintiff reported significant neck pain, often in conjunction with brachial plexus pain on the left shoulder, and had an MRI of the soft tissue scheduled. (R. 699.) On November 7, 2019, Plaintiff underwent a nerve conduction study of the left and right wrists

2

and digits, which showed mild to moderate carpal tunnel syndrome, as well as likely left rotator cuff impingement. (R. 688.)

On October 27, 2020, Plaintiff was given a chest X-ray as continuing diagnostic testing and treatment for her chronic asthma. (R. 872.) Her X-ray was found clear. (*Id*.) The treating physician, Dr. Barbara Mann, noted that she had a history of asthma, migraines and ankylosing spondylitis.[1] (R. 873.) Recent pulmonary function tests were normal, although they were conducted while Plaintiff was using her prescribed Advair inhaler, which may have affected the results. (*Id*.) Dr. Mann noted, however, that Plaintiff's recent move to a "more rural setting" might be cause for her allergies acting up, and she might require a lower dose of the asthma medication Wixela. (*Id*.)

On June 24, 2021, Plaintiff was examined by Dr. Jihan Grant who reported that Plaintiff had been complaining of severe headaches, typically in the region of the left forehead, with stabbing or throbbing sensations. (R. 357.) Dr. Grant noted that Plaintiff's headache triggers included her menstrual cycle, stress and sickness, and could be accompanied by feelings of photophobia, phonophobia, and osmophobia, as well as trouble staying asleep, irritability and nausea about 50% of the time, with rare vomiting. (R. 358.) Plaintiff also reported a burning sensation near her neck and left shoulder, as well as brief aura sensations, tooth pain, and eye tearing and redness during her migraines. (*Id*.) Dr. Grant noted that Plaintiff reported childhood head and neck trauma due to a nut falling on her head from a high tree as a child, rolling off the bed and fracturing her skull at 7 months old, and whiplash as a backseat passenger in 2001. (*Id*.) Due to Plaintiff's reported migraines with aura, a multiplanar multisequence MRI of the brain

---

[1] Ankylosing spondylitis is a "chronic multisystem inflammatory disorder" that can affect the sacroiliac joints initially, followed by joints of the axial skeleton and peripheral joints. It can cause pain, progressive stiffness and restricted range of motion. *Dorland's Illustrated Medical Dictionary* at 1724 (33d ed. 2020).

was conducted on July 25, 2021, revealing no evidence of acute intracranial abnormality, and no evidence of pathologic enhancement. (R. 484-86.)

At an August 31, 2021 appointment, Dr. Mann noted that Plaintiff was diagnosed with asthma for the first time at age 17 or 18, and was seen for it for the first time in November 2020. (R. 355.) Dr. Mann also noted that Plaintiff's move to Dutchess County, an area with "a lot of grass and trees," may have exacerbated her allergies. (*Id*.)

At a December 20, 2021 appointment with Dr. Ioannis Tassiulas, Plaintiff complained of chronic pain and intermittent swelling of the small joints of the hands and wrists, as well as chronic migraines. (R. 347.) X-rays of both hands revealed no fracture or dislocation, no significant joint space narrowing, no soft tissue swelling and normal osseous mineralization. (*Id*.)

On March 14, 2022, Plaintiff had a telehealth visit with Dr. Laurie Edelman who was at that point her primary care physician. (R. 333-34.) Plaintiff reported upper respiratory infection symptoms that past January, for which she went to urgent care, as well as a flare-up of arthritis of the neck and frequent headaches. (R. 334.)

In an assessment on May 20, 2022, Dr. Waqas Malick noted that Plaintiff had reported fatigue, possibly due to long COVID-19, or possibly due to the side effects of Toprol and Gabapentin, which Plaintiff had at that point been taking for years. (R. 330.) Dr. Malick also noted Plaintiff's atypical chest pain, and that she was at risk for atherosclerosis and cardiovascular events due to hyperlipidemia and inflammation. (*Id*.)

**B.    July 15, 2022 Motor Vehicle Accident**

On July 15, 2022, Plaintiff was admitted to the emergency department at Vassar Brothers Medical Center in Poughkeepsie, New York, after a motor vehicle accident. (R. 584.) Plaintiff

reported that she had been driving on the Taconic State Parkway at approximately 40-45 m.p.h. and had begun to take an exit ramp when she experienced a spasm of the left leg and could not control the brakes of her car. (*Id*.) This resulted in her hitting a guardrail and another vehicle. (*Id*.) When Emergency Medical Services reached her, she reported neck and clavicle pain, as well as pain down the left side of her body, but denied loss of consciousness or head trauma. (*Id*.) She was wearing a seatbelt at the time of the accident, but the airbag did not deploy. (*Id*.) She was examined and given a C collar at the scene, before being brought to the emergency department. (*Id*.) There, she was given extensive X-rays and CT scans, including of the brain and cervical spine, revealing no acute traumatic injury. (R. 586, 591-92.)

### C.    Medical Treatment After the July 15, 2022 AOD

On August 16, 2022, Plaintiff had a cardiology appointment with Dr. Christopher Marnell at the Lauder Family Ambulatory Center, a Mount Sinai cardiology outpatient clinic. (R. 305.) Dr. Marnell noted that Plaintiff had been diagnosed with COVID-19 in October 2020, and had been experiencing fatigue ever since. (*Id*.) She also complained of atypical chest pain and shortness of breath. (R. 974.) On the same day, Plaintiff underwent an exercise stress test at Mount Sinai Medical Center, which measured her heart rate and blood pressure at several intervals. (R. 974-75.) Her exercise capacity was found to be above average, and her heart rate response was appropriate. (R. 974.)

At an appointment with Dr. Mann on August 30, 2022, it was noted that Plaintiff had tested positive for COVID-19 (although here it was noted that this happened in August, not October, of 2020) and had post-COVID fatigue. (R. 303-04.) Dr. Mann also noted that the July 15,

2022 motor vehicle accident triggered more pain due to Plaintiff's ankylosing spondylitis, and that Plaintiff went to therapy three times a week after the accident. (R. 303.)

On September 15, 2022, Dr. Karl Ziermann ordered a lumbar MRI after Plaintiff complained of lower back pain radiating down the left leg. (R. 681.) The examination identified mild straightening of the lumbar lordosis, shallow levoscoliosis of the lumbar spine, with apex at the L3/4 level, and mild disc degeneration from the L3/4 through L5/S1 levels. (*Id*.)

On December 12, 2022, Plaintiff visited the Mount Sinai Center for Headache and Pain Medicine. (R. 640.) Dr. Grant noted Plaintiff's ongoing history of headaches, and the fact that her headaches typically occur much more frequently on the left forehead, extending to the temples and vertex. (R. 641.) According to Plaintiff, her headaches are "stabbing/throbbing and severe, but rarely debilitating." (*Id*.)

At a January 9, 2023 telehealth visit, Dr. Edelman noted that Plaintiff complained of sacroiliac joint issues. (R. 636-37.) Plaintiff noted that the pain was worse when going up stairs or if she stood after sitting for long periods of time, or when walking or standing for long periods of time. (*Id*.) By this point she had had injections, physical therapy and follow-ups with a rheumatologist to treat the pain. (*Id*.)

On February 28, 2023, Plaintiff saw Dr. Sayeda Hussain for chronic pain and intermittent swelling of the small joints of the hands, as well as pain in the left upper extremity. (R. 627.) Dr. Hussain noted that Plaintiff had complained of episodes of intermittent swelling of the bilateral wrist and small joints of the hands before and had been diagnosed with carpal tunnel syndrome. (R. 627.) Now, Plaintiff was complaining of stiffness and pain around the neck starting a week

earlier, which she attributed to "an accident one month ago."[2] (R. 628.) She also reported electric pain "shooting down her left lower extremity," and stated that she could also feel it in her "feet and ankles when swelling is severe." (*Id*.) Plaintiff reported that her legs, feet, and hands often felt tingly or fell asleep. (*Id*.) She stated she had followed up with a neurologist about her headaches, and had received injections to the sacroiliac joint, as well as two epidurals in the spine, without relief. (*Id*.)

On May 10, 2023, Plaintiff was examined for left hip pain by Dr. Vishtal Mehta in orthopedics at Mount Sinai. (R. 739.) Dr. Mehta noted that Plaintiff's pain began after her automobile accident on July 15, 2022. (R. 740.) Plaintiff reported the pain as aching and sharp, and said that it occurred intermittently, with various types of activity. (*Id*.) She reported trying cortisone injections for hip bursitis, physical therapy and epidural injections, with little to no improvement of her symptoms. (*Id*.) Upon examination, Dr. Mehta noted that Plaintiff's range of motion flexion was 0-110 symmetric bilaterally. (R. 742.) Internal and external rotation at 90° of flexion was 40 and 70° symmetric bilaterally. (*Id*.) Dr. Mehta noted no limb length discrepancy and a gait that was mildly antalgic without a limp. (*Id*.) Radiographs of the left hip from earlier imaging also were examined. (*Id*.) They demonstrated hip joint space narrowing, subchondral sclerosis and cysts, and periarticular osteophyte formation, with no fracture, dislocation and no lytic or blastic lesions. (*Id*.) MRI scans without contrast showed an anterosuperior labrum tear with avascular necrosis. (*Id*.) Due to the observed degenerative changes of the left hip, Dr. Mehta recommended an MRI with contrast to evaluate for internal derangement of the hip joint. (*Id*.)

---

[2] It is unclear to what accident Plaintiff here refers, or if she meant the motor vehicle accident and the physician simply noted the date incorrectly.

At a June 27, 2023 follow-up visit to Dr. Hussain, Plaintiff reported pain largely concentrated on the left side but starting to move to the right side. (R. 731.) This included bilateral pain in her elbows, pain in her left knee accompanied by swelling, as well as pain and severe swelling in her feet and ankles, and numbness and tingling. (*Id*.) Plaintiff stated that she was easily fatigued and her body felt heavy, such that she had to adjust her behavior or posture often. (*Id*.) These adjustments included stopping to rest while brushing her teeth, squatting instead of standing in the shower, or rocking from side to side to alleviate pain while seated. (*Id*.) Plaintiff reported that much of this pain started after her "accident one month ago" with "trauma in the neck," for which she had physical therapy and was taking muscle relaxants. (*Id*.) Dr. Hussain recommended a follow-up with orthopedic surgery for left hip symptoms. (R. 733.)

On June 29, 2023, Plaintiff was given an interarticular right hip joint injection by Dr. Christopher Lee. (R. 731.) On June 30, 2023, Dr. Mehta reexamined Plaintiff at a follow-up appointment, and noted that although a lidocaine injection had helped her pain significantly, other conservative measures had failed. (R. 729.) As the problem seemed to be with her left hip joint, Dr. Mehta discussed various hip surgeries, including total hip replacement. (*Id*.)

At a telehealth visit on July 13, 2023 with Dr. Philip Maynard, Plaintiff reported continuing migraines, poor sleep and increased stress from being unemployed. (R. 723.) She reported that her migraines were often accompanied by auras, red or white lights, or a burning sensation from temple to neck. (*Id*.) Her migraines tended to wake her up at 2:00 a.m. two or three times a week. (*Id*.) The pain was more often on the left side, but even worse when it was on the right side. (*Id*.) She also more rarely experienced a stabbing or zapping headache. (R. 725.) Dr. Maynard noted that she was perimenopausal, and that the hormone fluctuations, as well as overuse of

medications, might be exacerbating her headaches. (*Id*.) Dr. Maynard suggested adjusting Plaintiff's medication and having her keep a headache diary. (R. 725-26.)

On August 11, 2023, Dr. Mehta saw Plaintiff for a follow-up appointment and determined that she was an appropriate candidate for a total left hip replacement. (R. 711.) Plaintiff's surgery went forward on September 14, 2023. (R. 986.)

### D.        Internal Medicine Consultative Examination

On January 18, 2023, Plaintiff saw Dr. Kautilya Puri for an internal medicine consultative examination. (R. 560.) Dr. Puri noted that Plaintiff had had a history of lower back pain since 2011, and a history of asthma since 2006, which caused episodes of shortness of breath but had recently been well-controlled with an inhaler. (*Id*.) Dr. Puri also noted Plaintiff's history of neck pain, for which Plaintiff underwent an MRI of the cervical spine, and her history of bilateral carpal tunnel syndrome, with "aching pains in her hands on gripping and lifting." (*Id*.) Dr. Puri noted that positive bloodwork had led to Plaintiff's diagnosis of ankylosing spondylitis. (*Id*.)

In terms of daily activities, Plaintiff reported that she did some cooking and laundry, and could shower and dress herself. (R. 561.) She also reported that she watched TV, listened to the radio and went out. (*Id*.)

Dr. Puri noted that Plaintiff had a slight limp favoring her right side, but could stand on her heels and toes, squat moderately, halfway decreased, and rise from her chair without assistance. (*Id*.) In a musculoskeletal examination, Dr. Puri noted that Plaintiff's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (R. 562.) There was no evidence of scoliosis, kyphosis, or abnormality in the thoracic spine. (*Id*.) The

9

lumbar spine showed decreased flexion at 55 degrees with decreased extension, lateral flexion and rotary movements 10 degrees with mild to moderate tenderness. (*Id*.)

Dr. Puri concluded that Plaintiff did not have any objective limitation to communication or fine or gross motor activities. (R. 563.) She had mild limitations in her gait and her daily living activities, as well as mild to moderate limitations with squatting, bending, stooping and kneeling, and moderate limitations in lifting weights. (*Id*.) Dr. Puri recommended Plaintiff see an orthopedist and avoid environments that might worsen her respiratory issues. (*Id*.)

### E.    State Agency Consultants

On February 10, 2023, state agency consultant Dr. J. Sharif-Najafi reviewed the record and opined that Plaintiff could perform a range of light exertional work, including lifting and/or carrying up to 20 pounds occasionally and 10 pounds frequently, standing and/or walking about six hours, and sitting about six hours in an eight-hour workday. (R. 70.) He also opined that Plaintiff occasionally could climb ramps and stairs, never climb ladders, ropes, or scaffolds, and occasionally balance, kneel, crouch, stoop and crawl. (R. 71.) In addition, Dr. Sharif-Najafi opined that Plaintiff should avoid all exposure to hazards such as machinery and heights due to her history of asthma and migraines. (R. 72.)

On June 28, 2023, State agency medical consultant Dr. M. Angelotti reviewed the record and opined that Plaintiff could perform a range of light exertional work, except Dr. Angelotti found that Plaintiff occasionally could climb ladders, ropes, and scaffolds, frequently balance, and needed to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards. (R. 58-60.)

**IV.      February 27, 2024 Administrative Hearing**

**A.      Plaintiff's Testimony**

During the February 27, 2024 Administrative Hearing, Plaintiff testified that she lived at home with her husband, a security guard at a community college, and her 20-year-old daughter, a student at the Culinary Institute of America. (R. 43-44.) She stated that she had not driven since her car accident, nor did she take public transportation. (R. 44.) Instead, she depended upon her husband or daughter to drive her anywhere she needed to go, including to physical therapy. (*Id.*) In terms of housework, Plaintiff testified that she only could cook simple things, like oatmeal or a fried egg, but could not put things in the oven. (*Id.*) She also could not do more than light cleaning, including dusting and washing some dishes, because "I can't stand for too long." (R. 45.)

In terms of social life, Plaintiff testified that she didn't go out anymore because she "cannot really leave the house," but her friends came over to see her. (*Id.*) Plaintiff also described her limitations when trying to keep up with others: ". . . I can't walk and I can't keep up walking with them. You know, I have to constantly stop, especially when I get weak, I have to stop right there and I'd rather just stay home than have to slow everybody down." (*Id.*) Plaintiff also described restlessness when sedentary (R. 45 ("Most of the time, I'm pacing because I can't sit too long. I can't stand too long.").) Plaintiff said she mostly watched TV or did puzzles to pass the time at home, but she "used to do so many things and . . . can't do it anymore." (R. 46.) When asked whether her hip replacement had been successful, Plaintiff stated that, although the doctor told her it was in the right position and successful, "[s]o far I'm going to say no because I'm still having problems with it." (R. 47-48.) Plaintiff elaborated that the pain had gotten worse since her hip replacement:

11

> I'm not able to stand comfortably on it. I can't sit for a long time. If I stand I'm normally walking from side to side because it hurts. And if I'm going uphill or up the stairs, I can't put any weight on the left leg. I have to use my right leg for each step to go up.

(R. 48.) Plaintiff testified that she was in constant pain and always felt fatigued. (*Id.*) Towards the end of her time working, she had to have coworkers help her out because she was not able do her work alone, as it was difficult for her to sit. (*Id.*) Upon questioning by counsel, Plaintiff stated that she could sit comfortably upright in a chair for ten minutes before having to change positions. (R. 51.) Typing was also difficult for her, as her fingers would swell up. (R. 48-49.) Plaintiff testified that holding a pen or pencil also caused her pain, and she tended to drop things without noticing. (R. 49.) ALJ Stacchini also briefly questioned Plaintiff about her asthma, for which she took a preventive inhaler, and her headaches, which she stated occurred five to six times a month. (R. 50.)

### B. Vocational Expert Testimony

VE Erbacher also testified at the hearing. (R. 52-54.) VE Erbacher identified Plaintiff's past relevant work as an administrative aide (Dictionary of Occupational Titles ("DOT") Code 375.362-010). (R. 52.) The ALJ then asked VE Erbacher to assume a hypothetical individual with the same age, education and past work experience as Plaintiff, who was limited to occasional climbing of ramps and stairs without climbing ladders, ropes or scaffolds, and only occasional balancing, stooping, kneeling, crouching and crawling, with up to frequent reaching, handling, and fingering, while avoiding concentrated exposure to atmospheric conditions, unprotected heights and hazardous machinery. (R. 52.) VE Erbacher testified that, based upon those limitations, Plaintiff would be able to perform her past work. (R. 52-53.)

In response to ALJ Stacchini's questioning, VE Erbacher then testified that, if Plaintiff were limited to occasional reaching, handling, and fingering, that would preclude her past work. (R. 53.) If Plaintiff were limited to four hours sitting or one hour standing, that would preclude all full-time work. (*Id.*) VE Erbacher further testified that, based upon her vocational opinion and experience, an individual could be off task for less than fifteen percent of the workday and absent up to one full day a month before being precluded from all full-time work. (*Id.*)

## V.    ALJ Stacchini's Decision

In a decision dated May 8, 2024, applying the Commissioner's five-step sequential evaluation, *see* Legal Standards Section II, *infra*, ALJ Stacchini found at step one that Plaintiff had not engaged in substantial gainful activity since July 15, 2022, the AOD. (R. 13.)

At step two, the ALJ determined that the following impairments were severe: ankylosing spondylitis, degenerative disc disease of the cervical and lumbar spine, bilateral carpal tunnel syndrome, left hip avascular necrosis and labral tear, migraine headaches and asthma. (R. 13.)

At step three, the ALJ found that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14.)

The ALJ then assessed Plaintiff's residual functional capacity ("RFC"). (R. 15-22.) The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . .." (R. 16.) The ALJ determined that Plaintiff could perform sedentary work, except that she could occasionally climb ramps and stairs, but not ladders, ropes, or scaffolds. (R. 15.) The ALJ also determined that Plaintiff could occasionally balance, stoop, kneel, crouch and crawl,

13

and could frequently reach, handle and finger. (*Id.*) The ALJ also limited Plaintiff to avoiding concentrated exposure to atmospheric conditions, unprotected heights and hazardous machinery. (*Id.*)

At step four, the ALJ found that Plaintiff was able to perform her past relevant work as a police clerk, as the work did not require the performance of work-related activities precluded by Ana's RFC. (R. 22.) Because the ALJ found that Plaintiff was able to perform her past relevant work at step four, he did not need to reach step five. (*See* R. 11.) Therefore, the ALJ found that Plaintiff was not disabled during the relevant period and denied her claim for benefits. (R. 22.)

## LEGAL STANDARDS

### I.    Standard Of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.* (internal citation omitted); *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the

errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise.*" *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *See Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.    Determination Of Disability

A person is considered disabled for benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . " 42 U.S.C. § 1382c(a)(3)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate

15

area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4) (internal citations omitted).

16

If it is determined that the claimant is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 404.1520(a)(4). After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. § 404.1520(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that he cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 51-52. If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 404.1520(a)(4).

## DISCUSSION

In seeking remand, Plaintiff argues that the ALJ's decision was not supported by substantial evidence and was incorrect as a matter of law. (*See* Pl.'s 8/13/25 Mem. at 1.) Plaintiff further argues that the ALJ failed to consider all of Plaintiff's impairments in combination, as required. (*Id.* at 17-18 ("In reviewing the ALJ's hearing decision, it is clear that he did not view all of Plaintiff's conditions together in order to obtain an accurate picture of how these conditions together affect her ability to perform substantial gainful activity. Instead, the ALJ, in separate paragraphs, considered the impairments one by one . . ..").) In particular, Plaintiff argues that

17

"the ALJ's analysis of Plaintiff's combined impairments stopped" at the third step, *i.e.*, where the ALJ found that the medical severity of Plaintiff's impairments did not meet one of the Listings (*see id.* at 18 (citing ALJ Decision at R. 14-15)), thereby implying that the ALJ did not consider Plaintiff's impairments in combination when assessing Plaintiff's RFC. As explained below, the Court finds that Plaintiff's arguments lack merit.

## I.    The ALJ's Decision Is Supported By Substantial Evidence

Other than mentioning the substantial evidence standard in the "Scope of Review" paragraph of her moving memorandum, and including conclusory statements in her opening "Statement of the Case" paragraph and "Conclusion" paragraph regarding the purported lack of substantial evidence (Pl.'s 8/13/25 Mem. at 1, 12, 19), Plaintiff makes no attempt to explain how or why the ALJ's decision was not supported by substantial evidence. As the medical evidence summarized above reflects (*see* Background Section III, *supra*), and as set forth extensively by the ALJ in his decision (*see* R. 15-22), there is substantial evidence to support the ALJ's decision that Plaintiff has the RFC to perform sedentary work, with certain limitations.

As the Commissioner points out, the ALJ's RFC determination is supported by the opinions of State agency medical consultants Dr. Najafi and Dr. Angelotti, as well as consultative examiner Dr. Puri. (*See* R. 64-75, 560-63; *see also* Comm'r's Br. at 5.) Indeed, the ALJ's RFC determination imposed greater restrictions than would have been required based upon the opinions of Dr. Sharif-Najafi, Dr. Angelotti and Dr. Puri.[3] (*See* R. 74 (Dr. Sharif-Najafi assessing that Plaintiff could

---

[3] Remand is not required here based upon the fact that the "ALJ's RFC finding is more restrictive than the limitations set forth in [the opinions of Dr. Sharif-Najafi, Dr. Angelotti and Dr. Puri], inasmuch as any alleged error in this regard inure[d] to [Plaintiff's] benefit." *Baker v. Berryhill*, No. 15-CV-00943 (MAT), 2018 WL 1173782, at *4 (W.D.N.Y. Mar. 6, 2018).

perform light work);[4] R. 57 (Dr. Angelotti affirming Dr. Sharif-Najafi's assessment of light work); R. 21 (ALJ "find[ing] that the evidence supports greater limitations in exertional and postural activities than was opined by [Dr. Puri]").) Based upon the very deferential standard of review, because a reasonable factfinder could conclude that the evidence supports the ALJ's RFC determination (and certainly would not have to conclude otherwise), the Court finds no basis to disturb the ALJ's decision. *See Banyai*, 767 F. App'x at 177.

## II.       The ALJ Did Not Err In His Consideration Of Plaintiff's Impairments

Plaintiff's argument that the ALJ did not consider all of Plaintiff's impairments in combination when determining Plaintiff's RFC (*see* Pl.'s 8/13/25 Mem., at 17-18) has no basis. The ALJ's decision contains an extensive discussion of Plaintiff's impairments. The ALJ found that Plaintiff had the following severe impairments: ankylosing spondylitis; degenerative disc disease of the cervical and lumbar spine; bilateral carpal tunnel syndrome; left hip avascular necrosis and labral tear; migraine headaches; and asthma. (R. 13.) The ALJ stated he made his RFC determination after "careful consideration of the entire record" and "hav[ing] considered all symptoms and the extent to which th[o]se symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence." (R. 15.) Moreover, in the section of his decision that analyzed Plaintiff's RFC, the ALJ expressly considered all of Plaintiff's severe impairments together in the final paragraph of the section:

---

[4] Light work is less restrictive than sedentary work. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. . . . Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §  404.1567(a). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id*. §  404.1567(b).

Based on the foregoing, I find the claimant has the above residual functional capacity assessment, which is supported by the totality of the objective findings, the claimant's subjective allegations regarding her pain and other symptoms, the medical opinions, and the prior administrative medical findings. I have considered the claimant's history and ongoing treatment for **ankylosing spondylitis**, **carpal tunnel syndrome**, and **degenerative disc disease of the cervical and lumbar spine**, with associated symptoms of chronic joint pain and swelling, and fatigue, which were exacerbated by the motor vehicle accident in July 2022. Following the accident, the claimant was also found to have **avascular necrosis and labral tear of the left hip**, for which she underwent a total hip replacement. Treatment records have shown signs of continued tenderness and pain affecting multiple joints, the neck, and the lumbar spine, but with intact sensation, normal motor strength, and functional range of motion in all extremities without use of any assistive devices or significant abnormalities in gait. As such, I find that the claimant has the residual functional capacity to perform sedentary work, with no more than occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, and frequent reaching, handling, and fingering. The claimant also has a history of **migraine headaches** and **asthma**, which are stable and well controlled with medications. Nevertheless, I find the claimant should also avoid climbing ladders, ropes, and scaffolds, and exposure to hazards and respiratory irritants, in consideration of these impairments.

(R. 21-22 (emphasis supplied).) In light of the foregoing, it is clear that the ALJ adequately considered the combined effect of Plaintiff's impairments. *See Wright v. Berryhill*, 687 F. App'x 45, 49 (2d Cir. 2017) ("We are satisfied . . . that the ALJ properly considered the combined effect of the Plaintiff's impairments in determining that the Plaintiff had the residual functional capacity to perform a range of light work. The ALJ specifically stated that he had considered 'the entire record' and 'all symptoms' in reaching his determination.").

One final point. Plaintiff argues in her moving memorandum that "[t]he RFC made no mention of Plaintiff's disabling migraine headaches." (Pl.'s 8/13/25 Mem., at 18.) If, by making this argument, Plaintiff is suggesting that the ALJ did not consider Plaintiff's migraines in making his RFC determination, she is mistaken.

20

In the RFC section of his decision, the ALJ noted that Plaintiff reported her migraines during several medical visits, including with "Dr. Grant in April 2023" (R. 18 ("the claimant did report an increase in her migraine headache frequency"); in July 2023, during which she "was seen for follow up of her migraine headaches by Dr. Maynard at the Center for Headaches and Pain Medicine" (R. 19); and during her consultative examination by Dr. Puri, at which the doctor noted Plaintiff's "complaints of lower backpain, cervical pain, bilateral carpal tunnel syndrome, asthma, *and migraine headaches*." (R. 20 (emphasis added).) The ALJ also noted Plaintiff's "migraine headaches" when he concluded that Plaintiff would have the RFC for "no greater than sedentary exertion." (R. 21.) In addition, the ALJ stated that, although Plaintiff's migraines (and asthma) were well-controlled with medication, he was setting an additional limitation that she stay away from "climbing ladders, ropes, and scaffolds, and exposure to hazards and respiratory irritants," presumably in response to her symptoms of dizziness,[5] which could become dangerous if they were to cause her to become unstable at a great height, and nausea, which could be triggered by breathing in such irritants. (R. 22.)

Accordingly, the Court finds that the ALJ did not err in his consideration of Plaintiff's impairments.

### CONCLUSION

For the reasons set forth above, Plaintiff's motion (ECF No. 10) is DENIED and the decision of the Commissioner is AFFIRMED. The Clerk of Court is respectfully requested to close this case.

**SO ORDERED.**

---

[5] Plaintiff had reported both dizziness and nausea as accompanying symptoms to her migraines. (R. 16.)

21

Dated:    July 2, 2026
            New York, New York

**STEWART D. AARON**
**United States Magistrate Judge**